UNITED STATES of America,

v.

BIOCLINICAL SYSTEMS, INC., et al.

Civ. No. JFM–87–401.

United States District Court,
D. Maryland.

June 29, 1987.

Wendy P. Arnell, U.S. Atty's. Office, Baltimore, Md., John R. Fleder, David A. Levitt, Office of Consumer Litigation, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

C. Lamar Garren, Piper & Marbury, Baltimore, Md., William D. Appler, McDermott, Will & Emerty, Washington, D.C., Michael J. Budow, Budow & Noble, Bethesda, Md., for defendants.

## MEMORANDUM

MOTZ, District Judge.

The Government has brought this action under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. Section 332(a) seeking to enjoin alleged violations of the Act by Bioclinical Systems, Inc. (a manufacturer of plated culture media) and two of its principals, Michael A. Besche and John H. Powers. The issues as framed by the original Complaint were substantially modified by a reinspection of Bioclinical's facility conducted by the FDA in April pursuant to an agreement reached by the parties at the Court's direction soon after suit was filed. After the reinspection an evidentiary hearing (comprising of approximately three days' of testimony) was held on the Government's motion for preliminary injunction. The parties submitted pre-hearing and post-hearing memoranda, and the issues are now ripe for decision. The Government's motion will be denied.

The FDA's report of the FDA's April inspection identified 29 violations of the FDA's Good Manufacturing Practices ("GMPs"). Although they are to some extent interrelated, these violations may for present purposes be divided into two categories: those relating to Bioclinical's failure to attain a sterility assurance level ("SAL") of 0.1% and those not relating to that standard.

As to the second category, some of the matters in dispute have been resolved, or are in the process of being resolved, by the parties. These include the adoption of a modified sampling procedure to detect the contamination rate in the finished products, modification of standard operating proce-

dures in certain respects, making the standard operating procedures available in the immediate areas where operations are performed and taking steps to assure the continuing adequacy of the steam generator's capacity to meet the maximum needs of production. Likewise, Bioclinical has agreed to conduct another validation study to determine the adequacy of the aseptic fill process under current manufacturing conditions.[1] As indicated at the close of the preliminary injunction hearing, the Court finds as a fact that the Government has not proved its case as to the other violations falling in category two. In making this finding the Court strongly credits the testimony of Dr. Jack Young of Amsco, who was a thoroughly knowledgeable and credible witness.[2]

■ The fundamental question which divides the parties is whether or not the Compliance Office of the Division of Compliance Programs of the FDA may properly insist upon manufacturers of plated culture media meeting an SAL of 0.1%. It may not do so. Congress has mandated that a full and deliberate public process, including the making of recommendations by a broad-based advisory committee and the opportunity for public hearing, be followed before the FDA may establish a GMP. 21 U.S.C. 360j(f)(1)(B). The FDA has bypassed that process here. Instead, the Office of Compliance has been imposing an 0.1% SAL as a *de facto* requirement during the course of its inspections since March 1986 (when a draft set of Inspectional Guidelines incorporating the standard was issued by the

FDA's Center for Devices and Radiological Health).

■ The Government concedes that a GMP may not be properly established by adoption of a draft guideline. Rather, it argues that the 0.1% SAL constitutes a GMP independently of the draft guideline. This argument is conclusively rebutted by hard and concrete fact. A GMP must represent a *"current* good manufacturing process." *See* 21 U.S.C. 360j(f)(1)(A). The evidence in this case is overwhelming that the *in vitro* diagnostic device industry (including manufacturers of plated cultural media) does not attain an 0.1% SAL. Information provided by the Health Industry Manufacturers Association ("HIMA"), a national trade association representing over 300 manufacturers of medical devices and diagnostic products, fully supports Bioclinical's position that the 0.1% SAL is a criterion entirely of the Office of Compliance's own making. The Government, in response, has pointed to only a few isolated occurrences of alleged 0.1% SAL compliance. The credibility of its case has been substantially undercut not only by the paucity of these comparables but also by a flaw of logic in the FDA's reliance upon them. Cross-examination of the Chief of the Office of Compliance disclosed that the few companies which the Government now contends attained an 0.1% SAL were using measurement and validation processes which in this case the FDA has faulted Bioclinical for employing on the ground that they overstate the quality of SAL performance.[3]

---

1. In fact, it appears that this study has now been conducted. Results of that study were not, however, admitted into evidence because the study had not been completed until the preliminary injunction hearing was concluding without the FDA having had an opportunity to review it.

2. The Court does not believe that it would serve any useful purpose to recite in detail its reasons for the conclusions which it has reached on the various "category two" issues. If the Government desires clarification of the basis for the Court's ruling as to any particular point, it may file a motion for a supplementation of this memorandum.

3. The FDA appears to recognize that plated cultural media are not manufactured to be sterile.

Thus, in its draft Inspectional Guidelines it has asserted in *ipse dixit* fashion that plated culture media must be manufactured at an 0.1% SAL because users assume that plated cultural media will be sterile. The record does not support this proposition. Bioclinical and other manufacturers do not label their product as sterile, and the FDA has conducted no survey or accumulated other data to factually support its assertion. Furthermore, the record establishes that users must know that the media may not be sterile when used by them since it is uncontradicted that contamination can occur during transportation after the media have left the manufacturer's facility.

84

At bottom, what the Government is asserting here is that whatever the current industry practice may be, the SAL should be what the Office of Compliance dictates it to be. If the evidence demonstrated that the industry as a whole has been resisting in bad faith the adoption of a feasible good manufacturing practice in the face of a demonstrated hazard to the public health, there arguably would be merit in the Government's position. However, the evidence does not so demonstrate. Ideally, of course, plated culture media should be manufactured under sterile conditions. It may also be assumed (although the Government presented no evidence directly proving the fact) that technologically an 0.1% SAL could be met by the *in vitro* diagnostic device industry. However, the record does not establish that attainment of the 0.1% SAL is economically feasible. HIMA estimates the cost of that attainment to be in the millions of dollars. Although that estimate may be somewhat soft, Dr. Young confirmed the substantiality of the cost of making just one of the technological improvements suggested by the Government—the use of bulk sterilizers similar to those used in the drug industry.

More importantly, the record does not establish that the overriding interest of the public health requires the imposition of an 0.1% SAL. The National Committee for Clinical Laboratory Standards (consisting of representatives from industry, academia and the Government) has established as an acceptable standard of quality assurance a requirement that manufacturers apply a process that will limit contamination to less than 5% of plates in a lot. Dr. Patricia Charache, one of the Government's witnesses, while expressing legitimate concerns about the use of contaminated culture media (which should be carefully considered by the FDA when it follows the statutorily-prescribed deliberation process) testified that a contamination rate of 1%— determined by testing a sample of production run—is "a very stringent one."[4] Further, by frequently treating occurrences of contamination in plated culture media as Class III recalls (requiring not actual recall of product but only public notification of the fact of the contamination), the FDA itself has indirectly indicated that contamination in plated culture media does not routinely cause adverse health consequences.

The question of whether or not an 0.1% SAL should be established as a GMP for the manufacture of plated culture media is not one which is within the expertise or the power of this Court to resolve. However, it is equally not within the power of the FDA's Office of Compliance to impose the requirement unilaterally. Congress has specifically established the public review process which must followed to resolve an issue of this magnitude, and it is through that process, not through enforcement actions, that the questions of public health and of technological and economic feasibility posed by the 0.1% SAL are to be decided.

A separate order denying plaintiff's motion for preliminary injunction is being entered herewith.

---

4. Two other outside experts appearing for the Government (whose qualifications and credibility the Court fully accepts) did not directly address the issue of whether an 0.1% SAL is required for plated culture media. Rather, they tacitly assumed that Bioclinical's media should be sterile, i.e. manufactured at an 0.1% SAL, and, based on this assumption, they testified that there are defects in Bioclinical's manufacturing and validation processes which must be remedied.